ALVA L. RAGSDALE et al., appellees, v. CHURCH OF CHRIST IN ELDORA, IOWA, et al., appellants; IOWA CHRISTIAN MISSIONARY SOCIETY, defendant to counterclaim, appellee.

No. 48138.

(Reported in 55 N.W.2d 539)

475

NOVEMBER 11, 1952.

REHEARING DENIED FEBRUARY 13, 1953.

Lundy, Butler & Lundy, of Eldora, for appellants.

Paul W. Walters, Robert R. Jordan, and Bump & Bump, all of Des Moines, for appellees.

SMITH, J.—Defendant Schuler is the pastor and other defendants are the officers of defendant church. Plaintiffs were members of defendant church when defendant Schuler became pastor (March 1946) and until sometime in the fall of 1949 when their names were removed from the membership roll by vote of the membership.

In October 1949, purported amended Articles of Incorporation were filed which authorized adoption of by-laws and at about the same time by-laws were adopted under which the said removal of plaintiffs' names was later accomplished and other changes were made which plaintiffs claim constituted a diversion of the church property from uses of the fundamental faith and doctrines.

The trial court entered a decree in favor of plaintiffs, enjoining interference with plaintiffs' rights in the church property, enjoining defendant Schuler from preaching upon or occupying church property, establishing an ecclesiastical trust in the church property, restoring plaintiffs to membership, and canceling the purported amended Articles of Incorporation of 1949.

The parties, in brief and argument, devote approximately seventy printed pages in mere statement of facts and issues involved in this unfortunate controversy. The record itself covers practically nine hundred and the briefs over three hundred pages. There is a trunk full of exhibits. The difficulty of achieving any reasonable condensation here is apparent. The one hundred twenty-seven record pages of pleadings (exclusive of exhibits) manifestly contain much more than ultimate facts. They are made up largely of argumentative and evidentiary matter. The trial court should have invoked rule 81, R. C. P., and ordered the pleadings recast to afford more ready and accurate understanding of the real issues.

Without intending to impute individual blame to these parties, we observe at the outset that this and similar cases afford a sorry commentary on man's failure, after nineteen centuries, to understand and follow the simple teachings of the Man of Peace. Truly a civil court may, like Gamaliel (Acts V, 34–39), shrink from the role of umpire between conflicting doctrines and dogmas in such matters—may well remind itself constantly that only when civil, contract or property rights are involved may it assume to act. See 76 C. J. S., Religious Societies, section 86; 45 Am. Jur., Religious Societies, sections 40, 59; Ramsey v. Hicks, 174 Ind. 428, 91 N.E. 344, 351, 92 N.E. 164, 30 L. R. A., N.S., 665; Fussell v. Hail, 233 Ill. 73, 84 N.E. 42; Connoley v. Smith, 255 Ky. 630, 75 S.W.2d 222.

When such occasion does arise the difficulty of determining what are essential doctrines and what changes are so substantial as to warrant judicial interference becomes apparent. The instant case is an example in point.

All parties profess belief: in the "Fatherhood of God; that Jesus is the Christ, the Son of God, and the Saviour; that the Bible is the Word of God"; and in observance of the ordinance of baptism and in weekly observance of the Lord's Supper. All say they accept "no creed but Christ; no rule of faith and conduct but the Bible"; that they believe in co-operation among or by Christians and the *voluntary co-operation of churches.* Defendants add to the statement just italicized the qualification: "Insofar as the Churches in Bible times such as those of Ephesus and others * * * co-operated, but no further." Plaintiffs add to their statement of belief in "co-operation" the words "in order to get the work of the Church done."

The parties agree completely that the defendant church is autonomous or self-governing—of the congregational type as distinguished from the episcopal and presbyterian systems; that the local church is not subject to any control by a higher ecclesiastical organization; and that it is an independent entity, related to other local churches only by voluntary association and by common beliefs and practices.

Defendants claim the right, "representing the majority * * * to control in all matters with one exception only, that being that they cannot divert the property to another denomination or to the support of *doctrines fundamentally opposed to the characteristic doctrines* of the Church of Christ in Eldora."

Plaintiffs say: "In religious societies that are autonomous or self-governing, a majority may not divert the property from uses of the *fundamental faith,* immemorial customs, usages and practices."

We have emphasized the parts of these two statements we consider practically synonymous. "Doctrines" and "faith" are undoubtedly used with the same meaning. Whether plaintiffs intend something more by the added words "immemorial customs", etc., is not entirely clear. At another place in their brief they simply state: "Subject to the principle that local churches

may not change to another faith, they are autonomous or self-governing." That is a practical paraphrase of defendant's statement. Do plaintiffs claim "immemorial customs, usages and practices" are per se matters of faith? Or are they referring only to such ancient customs as are inherently related and necessary to the maintenance and propagation of their common religious faith?

Defendants quote a statement by plaintiffs: "The Disciples believed in 'co-operation', a word which had a definite meaning to them, and was a basic part of their religion * * *", and argue in effect that plaintiffs fail to distinguish between co-operation and *manner* of co-operation. They point out that "there is no prescribed manner of co-operation, the manner being a mere circumstantial * * * a matter of expediency and one in which the churches may have free scope." They add: "This is important because the Disciples of Christ organizations present simply one manner of co-operation among the Churches of Christ or Christian Churches. Appellees have apparently taken the position that the manner or method of co-operation formulated by the Disciples of Christ is exclusive, but this of course is not true." Thus they distinguish between Churches of Christ or Christian Churches and the "Disciples of Christ."

Some historical account should be given here. We are told the Christian Church, as a distinct denomination, originated or began to take form about the year 1809, out of the ministry and preaching of Thomas and Alexander Campbell in Pennsylvania and Barton W. Stone in Tennessee. As is true with most beginnings, the early stages are vague and it would be impossible to say just when the concept of a new religious denomination or brotherhood or convention emerged.

The name Christian Church or Church of Christ seems to be the original designation of churches of this faith. At some time in its history (possibly from the beginning) the word "Disciples" also came into use. Plaintiffs ask the court to establish and enforce an ecclesiastical trust "decreeing said church [defendant] to be a Christian Church of the Disciples of Christ." In their brief they ask that the property of defendant church "be decreed to be the property of the Christian Church, a member

of the Brotherhood of the Disciples of Christ." They apparently mean by this a decree requiring defendant church to co-operate or permit its members to co-operate with the state and international organizations.

Plaintiffs say "Although it is sometimes referred to as the Christian Church, this communion is officially known and listed in the United States census as the Disciples of Christ. Its churches always have one of two names, Christian Church or Church of Christ, according to local preference." They offer in support of the statement the testimony of Loren E. Lair, who identifies himself as the "Executive Secretary of the Iowa Christian Missionary Society." He refers throughout his testimony to the "brotherhood known as the Disciples of Christ."

Gaines Cook, another witness for plaintiffs, says he is "Executive Secretary of the International Convention of the Disciples of Christ" which, he says, held its first session in 1849. He describes it as "a democratic convention, a mass convention composed of those members of the churches of this fellowship who attend and who pay their registration fee * * * and who participate in its discussions." This is what plaintiffs mean by "co-operation" as distinguishing "Disciples" from "Independents."

The first Articles of Incorporation of defendant church (1868) contained a provision that if the corporation "shall cease to exist as a Church of Christ" the property "shall pass into the possession of the *Church of Christ known as the Disciples,* located nearest Eldora." (Italics supplied.) The second Articles (1891) had a similar reversionary clause, but for the "Church of Christ known as the Disciples" there is substituted "the General Missionary Convention of the State of Iowa, of the Church of Christ." The 1894 and 1944 Amendments, in similar clauses, name the same Missionary Convention, adding, "by any name by which it may be known."

The clause in the 1949 Articles however provides that "as far as all spiritual and religious matters are concerned, the membership shall follow the general leadership of the Church of Christ, but as far as property and property rights are concerned, this organization shall be free and independent of every other

organization whatsoever and in case of dissolution of the corporation, the properties * * * shall pass to, belong to and be the property of such organization as may be from time to time provided for in the by-laws."

This is the first reference in any of the articles to "by-laws." The 1949 Articles provide that trustees, elders and deacons shall constitute "the General Board of the Church with such powers and duties as are presented in these Articles *and with such further powers and duties as may be provided by the by-laws* from time to time." (Italics supplied.) There is a further clause purporting to give the General Board "power and authority to enact by-laws not inconsistent with these Articles and not contrary to church discipline", but with the further provision that such by-laws "may be altered or abrogated at any annual or special meeting of the membership."

The 1949 Articles also provide that by a two-thirds vote of the members of the General Board any member may be dropped from the membership roll who moves away or fails for one year to be "a regular attendant at the Lord's Day services of the church"; and also "any member may be dropped and removed from the rolls for any other cause which may be deemed sufficient by a concurrent vote of two thirds of the members present at any annual or special meeting of the membership but only after a full hearing upon not less than ten days' notice * * * as may be prescribed and given by the General Board." It was pursuant to this latter clause of the 1949 Articles that the names of plaintiffs were removed from the membership roll.

The variance of names among the churches of the Campbellite origin was surely not significant in the beginning. Defendant church is named in this suit and in its various Articles of Incorporation as "The Church of Christ in Eldora, Iowa." Witness Lair says churches under the name Christian Church or Church of Christ compose the "brotherhood known as the Disciples of Christ." Plaintiffs refer to "Disciples churches" and to "Independents" both using the name Church of Christ, making it "possible for a minister of the latter faith to get into a local church of the Disciples without the church being aware that he is of another faith * * *. Then when he has converted a majority

to his views, the church may be changed over to his faith by a vote of the majority, and the remaining members expelled." They add: "It is that kind of situation with which we have to deal here." The inference is there are two distinct denominations— Disciples and Independents—both using the name Church of Christ or Christian Church.

Plaintiffs' brief argues that defendant church "was organized as a Disciples church" quoting the first words in the first record book under date of May 20, 1855: "A congregation of Disciples was organized May 20, 1855, known as the Eldora Church." They point out there were forty direct references in that book "the words used being usually, the Disciples of Christ." However, we find no reason to assume there was at that time anything distinctive in that particular name or that it was intended to apply specifically to any problem of co-operation in church work.

They also point out that all the Articles of Incorporation (1868, 1891, 1894, 1944) "identify the church with the Disciples." They claim all ministers "prior to the schism" were Disciples ministers. We infer the "schism" referred to is the present controversy.

Defendant Schuler, pastor of defendant church, while admitting the names "Christian Church" and "Church of Christ" have been used interchangeably "in days gone by" without any difference in doctrine being indicated, objects strenuously to recognizing such organizations as being "affiliated [with] or denominated as Disciples." He does not however object to being called a disciple (small "d") "as a learner and follower of Christ."

Plaintiffs claim defendant church, as a "Disciples" church, was under some moral (though not legally binding) obligation heretofore observed to "co-operate" with other churches of similar Campbellite origin in a specific way "in order to get the work of the Church done"; and that defendant Schuler has led the defendant church to repudiate that "immemorial custom, usage and practice."

Defendants, on the other hand, reject the custom of co-operation through Missionary Societies, etc. (state and interna-

tional) formerly followed by defendant church and which plaintiffs wish the church to continue to follow. Defendants would get back to the co-operation practiced by the "Churches in Bible times such as those of Ephesus * * *."

This seems to be the real difference between the parties and the court is asked by plaintiff to hold the defendants are diverting the property of defendant church "from uses of the fundamental faith, immemorial customs, usages and practices." The trial court granted plaintiffs the relief demanded and defendants appeal.

I. This may be an over-simplification of the controversy but it at least brings out the question involved, viz., affiliation with other organizations of the same denomination. We do not agree that co-operation with other Churches of Christ, or Christian Churches, through any particular organization, such as "Iowa Christian Convention", "Iowa Christian Missionary Society", "United Christian Missionary Society" or "International Convention of Disciples of Christ, Inc." may be or become a matter of fundamental faith from which the majority of an individual church may not depart; or that the property of the individual autonomous church is held in trust for the purpose of promulgating or perpetuating any particular manner of co-operation.

The various organizations enumerated above are not so much organizations of individual churches as of individual *members*. It is true their purpose is to support missionary effort and probably other church activities of the denomination. But we find no evidence that their support is compulsory upon the individual church or members. The very independent and autonomous character of the individual church precludes the possibility of any *doctrine* of compulsory support of such institutions, however worthy and even necessary they may appear to be.

In Keith v. First Baptist Church, 243 Iowa 616, 624, 50 N.W.2d 803, 807, it is held that "disassociation with the [Baptist] Conventions" did not threaten such change in the basic doctrines of the defendant local church as to constitute a taking of plaintiffs' property in the church. In that case the majority of the members of the defendant local church had voted to amend its

Articles by deleting the words " 'and to co-operate with the Iowa Baptist. Convention, and the Northern Baptist Convention, in religious, philanthropic, and educational work, both in the Home and Foreign fields' ", substituting in lieu thereof a statement of the purpose of the church to support and maintain in the city of Algona, Iowa, " 'permanent, public religious worship and services in harmony with * * * accepted interpretations and usages of the Baptist denomination.' " (At page 618 of 243 Iowa.) There was also a declaration of independence of " 'any organization, religious or otherwise.' "

Our opinion in that case points out the historic and admitted independence of local churches of the Baptist faith and holds "The general rule is that a church with a congregational form of government can by majority vote withdraw from a voluntary affiliation and make a new one", citing numerous authorities from other jurisdictions. (243 Iowa, page 627, 50 N.W.2d, at page 809.)

The principle is stated in 45 Am. Jur., Religious Societies, section 66, that in case of a schism "the fundamental inquiry is one of identity of organizations—in other words, which of the rival factions is the true representative and successor of the society as it existed prior to the schism." But in the next section (67) relating to schisms in churches of *strictly congregational organization*, it is said: "Thus, if. the principle of government of the society is that the majority rules, the application of the criterion * * * calls for an adherence to or sanction by the majority, and the numerical majority * * * must control the right to the use of the property." See also 76 C. J. S., Religious Societies, section 71b, page 853 et seq.

Here, plaintiffs' principal witness, Lair, expressly testifies there is no requirement that the local church participate in state work by attending conventions or sharing in programs planned by the council or give anything to state work. He says the same is true as to co-operation with the International Convention of the Disciples of Christ.

Our opinion in the Keith case, supra, seems to be consistent with the general rule and is conclusive against plaintiffs' contention and against the trial court's decision referred to in this division.

II. Defendant Schuler became pastor of defendant church in 1946. He says, "When I came here I learned that there was much grievance in the so-called official board made up of deaconesses, deacons and elders." We do not find any explanation in the record as to what this claimed existing friction was about or any reference to it by other witnesses.

According to his own testimony Mr. Schuler went about correcting the situation—"I said to the folk, this cannot go on. * * * I preached a sermon * * * in which *we* outlined the work of the church as given to us in the New Testament [and in] which *we* spoke about the qualifications of elders as being shepherds and leaders of the flock. * * * about the deacons as their part in the church that they were to command the physical things * * *."

No good purpose would be served by recounting the many changes brought about under his ministry. Certain it is, whatever trouble there was before his advent was not minimized under the subsequent proceedings culminating in the removal of plaintiffs' names from the church rolls. Mr. Schuler testifies it was not he but the majority of the church membership who changed the Articles of Incorporation and inaugurated the many changes complained of. That may be literally true but it is essentially incorrect. There can, under the record, be no doubt of his responsibility for the changes. As to the question of their propriety or wisdom or the manner in which they were effected we of course express no opinion. The majority at least acquiesced. We can only determine and pass on the legal question— has the property of the defendant church been diverted from the support of its fundamental faith or doctrine?

Plaintiffs claim such diversion in fifteen enumerated particulars. We have already considered the principal one involving affiliation or co-operation with other church organizations. Other changes, so far as established, do not pertain to basic religious doctrine. One contention is that defendants have added to the fundamental tenet, "No creed but Christ." This claim is based on the fact that By-law I, adopted in connection with the 1949 Amended Articles, provides for admission to membership of

"persons found to be qualified as believing in the Virgin Birth of Christ."

Witness Polk says "this is not in keeping with the principles of our movement from the very beginning, which is that we ask a man to make the good confession."

But is this doctrine of the Virgin Birth so fundamentally different from belief "in the Fatherhood of God", "that Jesus is the Son of God and the Saviour", and "that the Bible is the Word of God"? Is it basically a violation of the dictum or tenet "no creed but Christ, no rule of faith and conduct but the Bible"? There may be some theological distinction but there is none to the ordinary lay person. To most people Trinitarian belief imputes divine origin to Jesus, stemming from the New Testament account of His Birth.

In Mt. Zion Baptist Church v. Whitmore, 83 Iowa 138, 148, 49 N.W. 81, 84, 13 L. R. A. 198, it is said: "Nice distinctions or shades of opinion on doctrinal points or practice do not merit the interference of a court of equity, and it is only when the departure from the faith is so substantial as to amount to a diversion of the property from the trust purpose that courts will interfere."

In the cited case the theological or ecclesiastical question had by agreement been submitted to and decided by a "council of seven Baptist Ministers" and the court followed the decision so made. Unfortunately we have no such light here.

However, we are constrained to hold there were here no substantial or basic changes beyond the power of the majority to make. Churches of the congregational type labor under the same difficulties as afflict democratic systems in other fields. The majority's power is limited only by fundamental principles. In episcopal and even in presbyterian systems there is a higher ecclesiastical authority to which the dissatisfied minority of a local church may carry its grievances. That is not true under congregational systems. As to them the court must, as best it can, decide between church litigants on the basis that the power of the majority is limited only as we have stated.

III. Plaintiffs argue there is here a distinct and separate group (referred to as Independents) trying to take over various properties of the brotherhood known as the "Disciples of Christ." But as we have pointed out the so-called "Independents" here have not diverted the property to a different *faith*. Factions, though frequently unlovely, are not uncommon in democracies. And in democratic religious organizations, so long as they profess adherence to the original doctrine, the majority cannot be enjoined. The court cannot weigh the sincerity of such profession.

Defendants here reject the term "Disciples" because it has come to signify some particular system of collaboration or affiliation among individual churches. Plaintiffs accept the definition and assume it connotes a difference in doctrine, in fundamental faith. But we do not think the record bears out that contention.

IV. In our discussion thus far we have assumed the 1949 Articles were in effect. But plaintiffs plead they are invalid and ineffective because not duly adopted. The trial court found them void in that they were filed with the secretary of state September 29, some four or five days before they were adopted and approved by the congregation on October 4. They were executed and acknowledged September 26, ten days before adoption.

Their preamble was entirely wrong in that it recites notice of the proposed new amended articles "was given by reading same on the *17th day of September, 1944,* and the same adopted * * * on the *3rd day of October, 1944.*" Obviously the dates we have italicized were erroneous. As a matter of fact the entire paragraph we have quoted from above, and also the one preceding it referring to the Articles of Incorporation "now in force * * * but about to expire", were almost word for word identical with the preamble to the *1944* Articles.

Oral testimony was offered by defendants to the effect that these 1949 Amended Articles were in fact adopted October 3, 1949, and that notice thereof was read in church September 25 and October 2, 1949. It is argued this oral testimony establishes that proper notice was given in compliance with the provision of the 1944 Amended Articles which require notice "by reading

same at a regular Lord's day meeting within two weeks prior to the time fixed for the meeting."

But assuming the correctness of the oral testimony on the question of notice, we still have articles filed and approved in the office of the secretary of state and executed and acknowledged by the trustees before they were adopted by the membership of the church.

The question is important to plaintiffs because their expulsion was accomplished under by-laws which in turn were authorized only by the attempted 1949 Amendment to the Articles. The decision of the trial court must be affirmed at this point. We cannot hold the failure to follow section 504.1 was a mere irregularity. At the time the secretary of state acted there were no adopted amended articles to approve. Nor did they have any legal existence when signed and acknowledged by the trustees. The attempted removal of plaintiffs' names from the membership roll was therefore without legal authority.

The decree will be reversed except as to that part holding invalid the 1949 purported Amended Articles of Incorporation and the proceedings and acts thereunder, particularly the by-laws known in the record as Exhibit F, and the removal of plaintiffs' names from the membership roll of defendant church. As to these excepted matters the decision of the trial court is affirmed. Costs on appeal are ordered taxed, one third to appellant-defendants and two thirds to plaintiffs.

This disposition makes unnecessary any discussion of the counterclaim or cross-petition against the Iowa Christian Missionary Society.—Reversed in part, affirmed in part, and remanded for decree in accordance with this opinion.

All JUSTICES concur.