LUELLA LUEBKE et al., appellees, v. WILLIAM H. FREIMUTH et al., appellants.

No. 48978.

(Reported in 78 N.W. 2d 473)

September 18, 1956.

Rehearing Denied November 16, 1956.

A. J. Braginton, of Manson, and Arthur H. Johnson, of Fort Dodge, for appellants.

Breen, Breen & McCormick, of Fort Dodge, for appellees.

Smith, J.—Plaintiffs are the administrator and all of the heirs (except defendant William H. Freimuth) of the estate of Fred W. Freimuth, who died intestate on or about June 13, 1948, a resident of Manson, Calhoun County, Iowa. He was a widower and left no direct heirs.

Decedent was the eldest of ten children. Five survived him. His brother, William H. Freimuth (Bill) and wife, Anna, are the principal defendants here. Their daughter, Charlotte, and son-in-law, Leslie Arndt, are the other defendants.

The petition was filed March 1, 1951. It sought cancellation of a deed and bill of sale executed by Fred to his brother,

William, August 30, 1946, in Sauk County, Wisconsin; and an accounting and recovery of bank accounts, rents, etc., all alleged to have been obtained under "fiduciary or confidential" relationship and while decedent was incompetent.

There is a record of 1400 pages (in four volumes) the pleadings alone occupying 118 pages and composed largely of evidentiary material, with no limitation to *ultimate* facts which are usually deemed the proper subject matter of pleadings. Trial courts have much greater power under our rules than they ordinarily assert. They might save themselves and us much time and labor by exercising it more often. This is true in the matter of pleadings (rule 81, R.C.P.; Ragsdale v. Church of Christ, 244 Iowa 474, 55 N.W.2d 539); and even more importantly is it true in the matter of condensing the record on appeal (rule 340, R.C.P.; Lange v. Myers, 244 Iowa 1316, 60 N.W.2d 526; Thorne v. Reiser, 245 Iowa 123, 126 et seq., 60 N.W.2d 784) within proper bounds. We know of course the difficulty of condensation but attorneys and courts alike can better serve clients and the cause of justice by practicing it more freely. Manifestly we can here give only a general idea of what seems the pertinent facts necessary to reveal the actual situation.

The trial court entered decree for plaintiffs and defendants appeal.

Decedent lived alone in Manson, Iowa, after his wife died in 1934. He was German born—came to this country when six. He had some, but not much, country-school education. When his mother died (1938) he became executor of her will. His sister, Emma Eckhoff, says she did his bookkeeping and clerical work at that time and while his brother Bill was tenant on his farm. She testifies that relationship terminated when he decided to turn the job over to his sister-in-law, defendant Anna Freimuth: "That was in about 1943, * * * I didn't do any more of his work, in looking after his business after that."

The record is replete with evidence of the intimacy between the brothers Fred and Bill. The difference in their ages naturally grew less important as they grew older. Fred was apparently prosperous but not very active in a business way, not weighted too heavily with business cares at least, fond of fishing and other sports, and without dependents.

His brother Bill, fourteen years younger, somewhat better educated, aggressive but unfortunate in business ventures (apparently), seemed to furnish a welcome companion for fishing and other trips. Bill's various business attempts need not be recounted in detail: farming, stock feeding, road graveling, selling automobiles and farm machinery.

In 1930 he took voluntary bankruptcy. His then attorney, as witness here for defendants, says it was a "no-asset case." Fred was listed as a creditor for $3500. The former attorney testifies Bill "was all washed up financially." Thereafter he rented farms in northern Iowa and southern Minnesota and moved to Wells, Minnesota, about March 1, 1932, remaining in that state till 1940, engaged in farming, cattle and hog feeding, and other activities.

During this period of the depression he claims he made money, put it away secretly, and became the actual, though not the record, owner of most of the property involved here which stood in Fred's name. He does not explain Fred's financial decline which this would necessarily imply.

The trial court's finding at this point seems an accurate and able appraisal: "Throughout Bill's story of his business dealings he complains of ill luck, disaster, frauds committed upon him, schemes by designing bankers, lawyers and others trying to fleece him. There are many inconsistencies and much unnecessary detail by way of trimming, which drew him into obvious untruths. His own story of his business history is filled with stories of fraudulent transfers which he apparently viewed as ordinary business procedure."

After he returned to Iowa he occupied the land that still stood in Fred's name but made no move to take over the record title. There was a bank claim in Minnesota which he claims was fraudulent and he did not care to meet, preferring to rely later on the limitations statute.

The story of the execution of the conveyances involved here may be briefly told. Late in August 1946, Fred and defendants Bill and Anna ('with a young daughter) started on a fishing trip to Shell Lake, Wisconsin. The men had a cousin there and another at Spooner near by. Bill and his family traveled in their car; Fred, alone in his own. On the way the

cars became separated. Defendants, unable to find Fred, drove on to Shell Lake, vainly hoping he had gone on ahead. Telephone and radio search failed.

On August 28, after they had finally returned to Iowa, they received word from the sheriff at Baraboo, Wisconsin, that Fred was ill in a hospital there, many miles distant from and not on the way to Shell Lake or Spooner.

Defendants Bill and Anna, with daughter, started at once for Baraboo, arriving the 29th. It seems Fred had been found in that area, asleep or unconscious in his car, clothed only in his shorts with his other clothing piled on the seat. He was taken to the hospital in Baraboo August 27, 1946.

The doctor there testifies: "When I first examined him he was not rational or able to tell how and where (sic) he got there. During his stay in the hospital, there were times when he had to be restrained * * * and * * * did not talk coherently."

He talked vaguely at times about having been attacked and beaten, but it later developed his bruised appearance was due to disease.

He was delirious much of the time. He got out of bed the first night and the deputy sheriff was called and had to help the nurses get him back in. After that restraints were applied. The doctor testifies he was refusing to drink and talking to himself and that was "pretty much his condition * * * the day before he left the hospital." That would be August 29, 1946.

The doctor objected to his removal to Iowa on the 30th: "He was not out of his mind. He was sick." But the doctor also says: "At the time I examined him it was obvious that he had a mental disorder of some kind." The hospital finally required the patient to sign a waiver before releasing him.

The deed signed by Fred August 30 before starting for Iowa conveyed all his farm and town real estate; the bill of sale of the same date covered all the personal property on the approximately 160-acre farm. The attorney who drew the instruments was the district attorney but he died too soon to be available as a witness. There is no evidence he was acting as attorney for Fred or was giving him any independent legal advice.

The signing was done at the jail in the undersheriff's quarters. No one else was present except the attorney, sheriff, defendants and daughter. The papers were acknowledged before the attorney as notary public and witnessed by the attorney and sheriff. They were already prepared—the sheriff thinks in the attorney's office. The sheriff testifies: "Bill Freimuth was in contact with the district attorney during the day that he was here and the next day"; also "I talked with (him) before he came and told him the circumstances and the condition his brother was in so he knew the condition before he ever came here." The fair conclusion is the papers were previously prepared somewhere at Bill Freimuth's request and direction though he denies it. There is no testimony the attorney came to the hospital. Unfortunately we do not have the benefit of the attorney's version. At least one of the instruments was on an Iowa form, not available in Baraboo, but, as the trial court shrewdly observes, "available at the Somers, Iowa, bank where Bill had stopped before he left for Baraboo." The real estate was described accurately by section, township and range numbers. The attorney's secretary thinks the description was obtained by long distance but disclaims memory for details "after seven years." She does say "We didn't have any Iowa forms at all."

After the execution of the instruments the Freimuths started at once for Iowa. The papers were not filed for record until after Fred's death, over twenty-one months later. During that time he lived with Bill and Anna on the farm that had been conveyed, except for less than a week spent in the hospital at Fort Dodge. The Baraboo doctor had consented to Fred's removal from the hospital there "on condition and with the assurance from the relatives that he would immediately be transferred to a hospital in his home community." That assurance was not very literally observed.

Dr. E. B. Dawson of Fort Dodge was called to see Fred August 31, 1946. He testifies: "I think there definitely was some mental defection at that time. * * * It is hard to determine whether he was rational." The doctor made arrangements that night for him to be transferred immediately to the hospital, but his entrance was delayed until September 6, a week later.

While he was at the hospital, the doctor says, "he was more or less in a wild attitude at times, and other times quiet, and at times crying * * * and he would apparently talk about things that were not there * * *. At times he was quite normal as far as mental condition would be concerned, I presume."

Fred was released from the hospital September 12, and thereafter until he died was in the home with Bill and Anna.

I. The trial court properly proceeded first to inquire as to the existence of a confidential relationship in which Bill held the dominant position, placing the burden on plaintiffs as to that issue. That issue being met he held the burden was on defendants to show their good faith by clear and convincing proof. That too was proper. Woolwine v. Bryant, 244 Iowa 66, 54 N.W.2d 759, and authorities cited.

Plaintiff, with some plausibility, would reject entirely the issue of confidential relationship because of defendants' claim that the property involved was all Bill's anyway and kept in Fred's name for protection against creditors.

It is true defendants do make that contention but the issue of confidential relationship is present also and must be met since plaintiffs plead it and defendants deny it. We think the record however undoubtedly supports the finding that a relationship of trust and confidence existed. We have already pointed out the close association between the brothers, even beyond the normal area of mere blood relationship. See Restatement, Trusts, section 2b, page 8; Curtis v. Armagast, 158 Iowa 507, 528 et seq., 138 N.W. 873.

In Curtis v. Armagast (158 Iowa 528) defendants argued as defendants do here that the conveyance was to one who was already the beneficial owner of the property. The opinion (page 529) holds the burden was upon defendants to establish the contention because of the confidential relationship.

We also conclude that whatever may have been the situation between them in earlier years there is convincing evidence that Bill occupied the dominating position in the relationship when the conveyances were executed. He was the one called to the rescue when Fred, ill among strangers, needed help. It is incredible that Fred, in the physical and mental condition described by Baraboo witnesses, could be other than the sub-

servient party in his confidential relationship with defendants.

Dr. J. H. Houghton of Baraboo who was called by the sheriff to see him testifies he was "lucid and competent" when he left the hospital the morning of August 30, 1946: "If I had thought him at that time to be incompetent I never would have permitted him to sign his own release from the hospital."

But he also says that one afflicted with the disease Fred had at the time "can at times be delirious and at other times perfectly normal." And the doctor also says "it was obvious he had a mental disorder of some kind" and that such was his condition "the day before he left the hospital."

There is positive medical testimony as to Fred's incapacity immediately after his return to Iowa. Dr. J. Keith Pickens, of Fort Dodge, was called and saw him in the hospital twice daily between September 6 and 12, 1946. He testifies: "He was not mentally competent. There were periods of apparent lucidity, but in each case these periods were marred by conversation, comment or actions which tended to invalidate the apparent lucidity." We have already quoted Doctor Dawson, a witness for defendants, who said there was definitely "some mental defection."

Doctor Pickens' testimony was the most comprehensive of any medical testimony in the case but every doctor questioned indicated there was some mental involvement. Not one, from the time he was found unclothed in his car by the deputy sheriff of Sauk County, Wisconsin, to the days he belatedly spent in the hospital at Fort Dodge, Iowa, says he was sound mentally.

We need make no pronouncement as to the exact extent of his abnormality when he signed these conveyances and shortly thereafter transferred his three bank accounts. The evidence fully sustains the decision of the trial court that his mental condition rendered him unable to cope with an aggressive brother in a confidential relationship.

Fred was, under the record, clearly weakened mentally and physically, without independent legal advice and subject to the influence of a dominant confidential relationship with his brother and sister-in-law. See Johnson v. Johnson, 196 Iowa 343, 346, 191 N.W. 353.

II. The case is largely one of fact. The law of confidential relationship is well settled. Only the multiplicity of possible factual variations (as is true of most legal propositions) makes it and the law itself a subject of perpetual controversy and unfailing interest both to lawyers and to clients.

 The broad general rule is of course that fraud cannot be presumed but must be affirmatively proved by the one relying on it. But it is also equally well established that there is a presumption of fraud when one in a confidential relation with another profits at the expense of the person who confides in him. 37 C. J. S., Fraud, sections 94, 95. And the mental condition of the one whose action is in question becomes the proper subject of scrutiny. When confidential relationship exists he is correspondingly more susceptible to influence as his mentality weakens.

██ III. We find no merit in Bill's contention that he was already the owner of most of the property conveyed by Fred, even conceding the admissibility of all defendants' testimony (which we need not pass on). Its credibility is still questionable. The trial court in a remarkably able and thorough manner analyzes the testimony and weighs it with the added advantage we do not possess of having seen and heard most of the witnesses who testified.

We agree with the court's conclusion: "But apart from the question of competency of Bill Freimuth and Anna Freimuth as witnesses, and weighing the competent testimony which they may be permitted to give, and such other evidence as may tend to support them, the court now determines that defendants have not established the truth of their claim. The interest of these witnesses in the case, the manner in which they gave their testimony, the unreasonableness of the testimony itself, all cast such doubt upon the truth of their testimony that the court cannot accept it as true."

The rest of that paragraph of the trial court's opinion is also worthy of quotation here: "Bill Freimuth and his wife, Anna, now say they have been avoiding payment of legitimate inheritance tax to the state, have been avoiding the claims of creditors of Bill by means of falsehood, false signing of papers, and concealment over a period of years. Yet they now expect

the court to accept their present story as true, without substantial verification and without so much as a single piece of paper to corroborate them."

■ We deem this a proper case for us to lean heavily on the judgment of the trial court, even though we try it on appeal de novo. In re Estate of Custer, 229 Iowa 1061, 1071, 295 N.W. 848, citing In re Estate of Brooks, 229 Iowa 485, 493, 294 N. W. 735, and cases therein cited.

The daughter and son-in-law of Bill and Anna are made defendants as having acquired through them some interest in some of the property involved and not as active participants otherwise in the conduct complained of. Neither one testifies. We recognize there are many facts and facets in the long record which might be deemed interesting and worthy of mention. We have tried however to present a correct picture.

■ "Constructive fraud often exists where the parties * * * have a special confidential or fiduciary relation which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other. A course of dealing between persons so situated is watched with extreme jealousy and solicitude; and if there is found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party. No part of the jurisdiction of the court is more useful than that which it exercises in watching and controlling transactions between parties standing in such a relation of confidence to each other." 23 Am. Jur., Fraud and Deceit, section 14, pages 764, 765, citing many cases.

We would be derelict in our duty were we to do otherwise than uphold the trial court here. The decree is affirmed.—Affirmed.

All JUSTICES concur.