**PRESBYTERY OF CIMARRON,**
Appellant,

v.

**WESTMINSTER PRESBYTERIAN
CHURCH OF ENID et al.,**
Appellees.

No. 45435.

Supreme Court of Oklahoma.

Oct. 9, 1973.

Joe H. Glasser, McKeever, Glasser, McKeever & Conrad, Enid, for appellant.

Stephen Jones, Jones, Atkinson, Williams, Bane & Klingenberg, Enid, for appellees.

BARNES, Justice:

The present case involves a dispute between the parties as to the ownership of property, primarily two parcels of Enid real estate. One parcel had been conveyed to, and used by, an Enid Presbyterian Church as its headquarters and sanctuary for worship services; and the other was used as its manse or minister's residence.

The instrument by which the sanctuary property was conveyed to the Enid Church was a general warranty deed, conventionally worded in all material respects, executed and delivered in 1928 by a Mr. and Mrs. Hutchison, of St. Louis, Missouri. The grantee was The Westminster Presbyterian Church of Enid, Oklahoma, its successors and assigns.

Within less than sixty days after this deed was filed for record, the Enid Church was incorporated as an Oklahoma corporation for the purpose [according to its Arti-

cles of Incorporation] of forming "a local church for religious worship *affiliated with, and a part of, the Presbyterian Church of the United States of America.*" [Emphasis added.]

Although the record does not disclose the exact date that this Enid Church became affiliated with, and a part of, the Presbyterian Church of the United States of America, this is undisputedly alleged to have occurred later in the same year of its incorporation. For some time after its affiliation with said national Presbyterian organization, the Enid Church was a part of what was designated in the hierarchical structure of the Presbyterian Church of the United States of America as the "Enid Presbytery", but at some time before this action arose—presumably about the time that the Presbyterian Church of the United States in America became what is now known as the "United Presbyterian Church in the United States of America"—the Enid Presbytery became a part of a larger presbytery which, since some time before this action was filed, has been known as "Presbytery of Cimarron", hereinafter referred to as "plaintiff".

The Enid Church was also what was known in the national Presbyterian organization as a "National Mission Aid Church", and, through the Presbytery, the Enid Church received funds contributed for national missions by other churches in the Presbytery. Since 1958, the Enid Church has, at its request, received a total of $27,920.00 in such funds for use in paying salaries and housing allowances of its ministers.

In 1963, the Enid Church purchased the manse property, and, as a part of the consideration therefor, executed and delivered a promissory note, secured by a real estate mortgage on the property, in the amount of $6,000.00.

Thereafter, on the weekend of July 4, 1969, the Enid Church's minister contacted the Chairman of the plaintiff Presbytery's National Missions Committee and requested a special meeting with said Committee

to deal with a financial crisis in said Church. Thereafter, the Enid Church's minister and members of its Session had several meetings with this Committee, but, despite the efforts of some of those concerned, a satisfactory solution of the Church's financial problems was never discovered or agreed upon. Thereafter, plaintiff's National Missions Committee recommended that the Enid Church be dissolved, and a special meeting of the plaintiff Presbytery, as a judicatory of the United Presbyterian Church in the United States of America, was called for November 7, 1969, to act on this recommendation. At this meeting, a motion was made, seconded and adopted, which mandated the following actions, among others: (1) That the final worship service of the Enid Church be held December 28, 1969; (2) that said Church's Session issue letters to the members of its congregation authorizing transfers of their memberships to other congregations of the United Presbyterian Church in the United States of America; and (3) that the Trustees of the Enid Church transfer to plaintiff all properties then held by that Church.

The failure of the Enid Church to transfer its properties to plaintiff gave rise to the latter's institution of the present action on June 11, 1970, against the Enid Church and its Trustees, hereinafter collectively referred to as "defendant". In the petition it filed in the trial court, plaintiff alleged some of the foregoing facts and also alleged [in brief substance] that it is a judicatory body of the United Presbyterian Church in the United States of America, under whose Constitution, first promulgated in 1788 [with later amendments not material here], its affairs are administered from the local through the sectional, regional and national levels. Plaintiff attached to, and incorporated by reference in, its petition a copy of said Constitution and quoted from it the following provisions:

"A. 'A particular church can be organized only by the authority of the Presbytery.' (34.02)

"B. 'The Presbytery has power to receive and decide appeals, complaints and references brought before it in an orderly manner . . .; TO DISSOLVE CHURCHES (emphasis added) . . .' (42.07)

"C. 'Whenever . . . a particular church is formally dissolved by the Presbytery . . . such property as it may have, both real and personal, shall be held, used and applied for such purposes and trusts as the Presbytery may direct, limit and appoint or such property may be sold or disposed of as the Presbytery may direct in conformity with the Constitution of the United Presbyterian Church in the United States of America.' (62.11)

"D. 'When a church is dissolved the Presbytery with which it was connected shall take possession of its records and have jurisdiction over its members . . . .' (82.06)"

In its petition, plaintiff further alleged that it is the duly authorized and acting successor to the Enid Presbytery, which authorized the defendant's organization in the year of the latter's incorporation [under Oklahoma statutes] and that [under the above quoted Constitution] plaintiff is therefore the authority to "hold, use and apply", sell or dispose of both real and personal property of the formally dissolved Presbyterian Church.

Plaintiff further alleged that, as a result of action taken at its November 7, 1969 Presbytery meeting, the Clerk of defendant's Session was directed to transfer all its records, books, etc., to plaintiff's Stated Clerk, and defendant's Trustees were directed to inventory the property held by defendant and to transfer its title to plaintiff. Plaintiff further alleged that, though it had made demand upon defendant's Board of Trustees, through its Chairman, to comply with this direction and to execute and deliver to it proper conveyances of said property, said Trustees had failed and refused to do so.

The prayer of plaintiff's petition was for the court to render a declaratory judgment against defendant, determining that plaintiff, as the proper judicatory body under the Constitution of the United Presbyterian Church in the United States of America, is entitled to have, receive and hold all real and personal property of the defendant, and ordering defendant's Board of Trustees to forthwith execute and deliver to plaintiff deeds and other proper instruments necessary to transfer to plaintiff the record title to all of defendant's property, records, etc.

In its answer, the defendant Enid Church agreed that the parties' controversy, as to their respective rights and title to the property involved, should be settled by a declaratory judgment. But as to its rights and title, defendant stood on its muniments of record title, alleged that by vote of its Trustees and Session [or local governing body] it had become an autonomous Presbyterian Church, and it denied that there was any basis in its deeds to the properties, in State law, or in the Constitution of the "general church", for "imposing an implied trust" on the properties.

At the subsequent non-jury trial, plaintiff introduced in evidence, among other things, the aforementioned conveyances and the Constitution of the United Presbyterian Church in the United States of America [called the "Book of Order"], and established by stipulation and evidence [including some testimony] that the remaining balance of defendant's indebtedness in the amount of $2,404.83 had been paid through action taken, and money furnished, by plaintiff early in 1970, and that, some two weeks after this suit was filed, some members of the Enid Church's congregation met with four of its six Trustees and four of its six Elders and voted to "declare ourselves an autonomous Presbyterian Church known as the Westminster Presbyterian Church of Enid, Oklahoma", and expressed their desire to keep the subject church property.

At the close of plaintiff's evidence, defendant demurred to it and the court entered judgment sustaining this demurrer. After the overruling of its motion for a new trial, plaintiff lodged the present appeal.

Plaintiff's position in urging reversal of the trial court's judgment is, generally, that said order and/or judgment is contrary to the basic precepts laid down in the early case of Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), which most state and federal courts have recognized as the landmark decision in controversies of this character. Although plaintiff recognizes that the facts of this case make it one of first impression in this jurisdiction, it maintains that, under the weight of decisional law and the United States Constitution, the trial court should have recognized that the hereinbefore quoted provisions of the Constitution of the United Presbyterian Church in the United States of America control, and that, under those provisions, the court should have rendered a declaratory judgment in its favor.

It is the defendant's position, on the other hand, that the Constitution of the United Presbyterian Church in the United States of America has nothing to do with the title to the subject property, but that said title, under Oklahoma's statutes, can only be vested in the aforenamed corporation, "The Westminster Presbyterian Church of Enid, Oklahoma", which is still in existence, despite the hereinbefore described action of the plaintiff pursuant to its called meeting of November 7, 1969.

Watson v. Jones, supra, arose out of a schism in Louisville's Walnut Street Presbyterian Church, which, after its organization in 1842, was a part of the same national Presbyterian organization involved here, then called the "Presbyterian Church of the United States." One group of the Walnut Street Church's members [two of which claimed to be church Trustees and another two claiming to be Elders thereof]

renounced the authority of the various judicatories of the Presbyterian Church of the United States and aligned themselves with church authorities not connected with that organization. After members of this group had, by order of the General Assembly of the Presbyterian Church of the United States, been dropped from the roll of Elders of said Church, another group, alleging that they were members and officers of the Walnut Street congregation and also members in good standing of the Presbyterian Church of the United States, instituted Watson v. Jones as plaintiffs, to enjoin the aforementioned dissident group from taking possession of the Walnut Street church property, as they allegedly threatened to do [among other things], and for other relief. Without going into all the facts and the outcome of the case, we think for our purposes it is only necessary to allude to the following portions of the United States Supreme Court's opinion in that case:

"＊　＊　＊　＊　＊

"The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the state.

"1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, *by the express terms of the instrument devoted to the teaching, support or spread of some specific form of religious doctrine or belief.*

"2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.

"3. The third is *where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization.*

"＊　＊　＊

". . . the third of these classes of cases is the one which is oftenest found in the courts, and which, with reference to the number and difficulty of the questions involved, and to other considerations, is every way the most important.

"It is the case of property acquired *in any of the usual modes for the general use of a religious congregation which is itself part of a large and general organization* of some religious denomination, *with which it is more or less intimately connected by religious views and ecclesiastical government.*

"＊　＊　＊

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, *whenever the questions of . . . ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final,* and as binding on them, in their application to the case before them.

"＊　＊　＊

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establish-

ment of no sect. *The right to organize voluntary religious associations* to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and *for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.* But *it would be a vain consent* and would lead to the total subversion of such religious bodies, *if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed.* It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases *of ecclesiastical cognizance,* subject only to such appeals as the organism itself provides for.

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic law, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

" * * *

". . . the appellants in the case presented to us have separated themselves wholly from the church organization to which they belonged when this controversy commenced. They now deny its authority, denounce its action and refuse to abide by its judgments. They have first erected themselves into a new organization, and have since joined themselves to another totally different, if not hostile, to the one to which they belonged when the difficulty first began. Under any of the decisions which we have examined, the appellants, in their present position, have no right to the property, or to the use of it, which is the subject of this suit." [Emphasis added.]

▆▆▆ Defendant recognizes, and cites cases for, the proposition that civil courts are now restricted in assuming jurisdiction of church controversies, involving religious doctrine, by the First Amendment to the United States Constitution; but it says the courts will assume jurisdiction and inquire into the regularity of church proceedings where property rights are in jeopardy.

The present case does not involve religious doctrine. It involves religious "polity", or, as Webster's Dictionary defines the latter word: "form of government". And the ultimate issue is whether the Constitution of the United Presbyterian Church in the United States of America, a church with the hierarchical form of religious government, controls, or whether Oklahoma's conveyancing and property laws control.

Defendant's argument, citing the three possible approaches that courts may use in controversies involving church property [discussed in Eldership v. Church of God, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582] urges that under both the "Watson approach" and the "formal title" doctrine [using "neutral principles of law, developed for use in all property disputes", Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449, 89

S.Ct. 601, 606, 21 L.Ed.2d 658, 665] title to the property must be upheld in defendant [as the trial court's judgment had the effect of doing]. As we interpret the authorities, this Court is not free to do this. And it is our opinion, in accord with our quotation from Watson v. Jones, supra, that when the Westminster Presbyterian Church of Enid, Oklahoma—or its members for it—petitioned the Presbyterian Church of the United States in America for, and was granted, affiliation with that national church organization, it impliedly and in effect [if not expressly] agreed to abide by the national Church's constitution and regulations. As, at the time the present controversy arose, the Enid Church was an integral part of the larger church organization, it is bound, under that church's hierarchical form of government or polity, by its constitution and its judicatories' decisions. We think this conclusion is supported by the weight of all the better-reasoned decisions. In this connection, notice Presbytery of Indianapolis v. First United Presbyterian Church, 143 Ind.App. 72, 238 N.E.2d 479, reh., 240 N.E.2d 77. While we are not prepared to, and need not, say, as some might infer from some of the language in the cited case [238 N.E.2d 479, 486] that the form, or nature, of the grant under which the affiliating local church goes into possession of the property involved is immaterial [in this connection, notice Doughty v. Herr, 97 Ind.App. 427, 185 N.E. 657, discussed in Merryman v. Price, 147 Ind.App. 295, 259 N.E.2d 883], the deeds by which title was acquired in the present case were ordinary warranty deeds "without condition or limitation" [see Ramsey v. Hicks, 174 Ind. 428, 91 N. E. 344, 92 N.E. 164, discussed in the Presbytery of Indianapolis case, supra,] and contained no "express terms" devoting the properties thereby conveyed to any person, group of persons, either individually or in a trust or fiduciary capacity—or to "some form of religious doctrine or belief" [Watson v. Jones, supra,] other than may be inferred from the name of its grantee. It is our opinion that Doughty v. Herr and Merryman v. Price, supra, are both inapposite to, and are not persuasive in, the resolution of the present controversy because of factual differences. It is also our opinion that if, when a local church voluntarily becomes an integral part of a national hierarchical church, it is thereafter bound by the latter's constitution and its judicatories' decisions, the holding of its property is likewise controlled by such provisions of said constitution and the authorized mandates of said judicatories [as are applicable thereto] without regard to the so-called "trust" aspects of the situation, such as noted in the Indianapolis Presbytery case [238 N.E.2d 479, 487] and Cumberland Presby. Ch. v. Red Bank Cum. P.C., 58 Tenn.App. 424, 429, 430 S.W.2d 879, 882.

Therefore, under our theory of the controlling considerations in this case, it is unnecessary to discuss defendant's contention that 18 O.S.1971, §§ 564.1 and 564.2, at least implies such recognition.

Nor do we find the cases of Presbyterian Church in the United States v. Eastern Heights Presbyterian Church, and Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 224 Ga. 61, 159 S.E.2d 690, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658, 225 Ga. 259, 167 S.E.2d 658, of significant assistance in this case. As already noted, there is no recital in either of the deeds to the two parcels of subject real estate that in any manner restricts their use; and there is no "departure-from-doctrine element" involved in this controversy. From all that appears from the record, the schism here [if it may be correctly called that] resulted from financial difficulties, rather than from any differences in religious beliefs or claim that the United Presbyterian Church in the United States of America had departed from the doctrine its predecessor, the Presbyterian Church of the United States, had subscribed to, at the time the Enid Church affiliated with it. We are not certain exactly what the Georgia court meant when it said in the Eastern Heights case, supra [167 S.E.2d 658, 659], that the

implied trust theory there involved was not "required by the constitution of the general church"; but we have no hesitancy in concluding that the hereinbefore quoted provisions of the constitution of the United Presbyterian Church in the United States of America authorized the right which the plaintiff Presbytery claimed, and by its mandate attempted to exercise, in the present case.

It is therefore our opinion that the trial court erred in sustaining defendant's demurrer to plaintiff's evidence; and, on account of this error, he should have sustained plaintiff's motion for a new trial. Said court's order overruling said motion is therefore reversed, and this cause is remanded to that court with directions to grant plaintiff a new trial and proceed in a manner not inconsistent herewith.

DAVISON, C. J., WILLIAMS, V. C. J., and IRWIN, BERRY, LAVENDER and SIMMS, JJ., concur.

HODGES, J., dissents.