Doris FONKEN, Alvin Van Langen,
Lester Klaver, et al., Appellees,

v.

COMMUNITY CHURCH OF KAMRAR,
Hamilton County, Iowa, et al.,
Appellants.

No. 68478.

Supreme Court of Iowa.

Oct. 19, 1983.

W.K. Doran of Doran, Doran, Courter & Quinn, Boone, for appellants.

James L. Kramer and Thomas J. Bice of Johnson, Erb, Latham & Gibb, P.C., Fort Dodge, for appellees.

Larry J. Cohrt of Swisher & Cohrt, Waterloo, and Timothy Belz of Young & Belz, Clayton, Mo., for amicus curiae the membership of Colfax Center Presbyterian Church.

McCORMICK, Justice.

It is a paradox that disputes among church members, like disputes in families, can become emotional and bitter despite the high motives and essential decency of the people involved. When a schism occurs, the civil courts are sometimes asked to decide which faction is entitled to the property owned by the church. As the present case illustrates, the decision is difficult when church interests in property are not established through traditional legal instruments. The trial court held that title to the local church property was subject to an implied trust in the general church. On defendants' appeal from the decree for plaintiffs, we affirm. We also affirm on plaintiffs' cross-appeal from the trial court's order keeping defendants in possession of the property before the appeal was taken.

The role of civil courts in resolving church property disputes is affected by decisions of the United States Supreme Court construing the impact of the free exercise and establishment clauses of the first amendment of the federal Constitution. Because these decisions set the constitutional limits of state court inquiry, we first briefly summarize their holdings.

The starting point is *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), a pre-*Erie* diversity case applying federal common law in resolving a property dispute between a national Presbyterian organization and local churches affiliated with it. The Court characterized three kinds of church property disputes: one in which the title document requires the property to be devoted to use for some specific doctrine; a second in which the property is held by a congregation owing no fealty to a higher church government; and a third in which the local church is subordinate in a hierarchical scheme of ecclesiastical government. *Id.* at 722–23, 20 L.Ed. at 674. In the third category, which includes Presbyterian churches, the Court posited a principle of compulsory deference to decisions of church government: "It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." *Id.* at 729, 20 L.Ed. at 677.

In *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), the Court imposed a qualification on the deference principle by making it applicable "[i]n the absence of fraud, collusion or arbitrariness." *Id.* at 16, 50 S.Ct. at 7–8, 74 L.Ed. at 137. The principle of *Watson* as qualified in *Gonzalez* was approved as a Constitutional principle in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94, 116, 73 S.Ct. 143, 154–55, 97 L.Ed. 120, 136–37 (1952).

The Supreme Court subsequently held in *Presbyterian Church in the United States v.*

*Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) that civil courts are precluded by the first amendment from deciding doctrinal issues. *Id.* at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. Two local Georgia churches had withdrawn from their affiliation with a national Presbyterian organization. Georgia law recognized an implied trust in favor of the national church conditioned on adherence by the national organization to the same tenets of faith as existed at the time of original affiliation. This principle had been applied in the Georgia courts and resulted in an award of church property to the two local churches. In reversing and remanding, the Supreme Court held that civil courts cannot resolve doctrinal controversies in adjudicating church property disputes. On remand, the Georgia court refused to apply the implied trust theory without the departure-from-doctrine element, holding instead that the local churches were entitled to the property because the deeds to it were in their names. *See Presbyterian Church in the United States v. Eastern Heights Presbyterian Church in the United States,* 225 Ga. 259, 167 S.E.2d 658 (1969), *cert. denied,* 396 U.S. 1041, 90 S.Ct. 680, 24 L.Ed.2d 685 (1970).

In *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970), the Court upheld a state court decision awarding property to local churches who withdrew from a general church where the state court based its decision on a state statute, deeds, and local church charters giving property control to the local churches. Governing documents of the general church were found not to give it control of the property. Thus the Supreme Court approved a state court's adjudication of a property dispute through use of neutral principles of law affecting ownership rather than through use of the compulsory deference approach of *Watson.* In a special concurrence, Justice Brennan suggested that the *Watson* and neutral principles approaches were complementary and not merely alternative. *Id.* at 370 n. 4, 90 S.Ct. at 501, 24 L.Ed.2d at 585.

The *Watson* approach was approved again in *Serbian Eastern Orthodox Diocese for the United States v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). The Court also cut back the *Gonzalez* qualification on the *Watson* holding by precluding an inquiry into arbitrariness of ecclesiastical decisions. *Id.* at 712–13, 96 S.Ct. at 2382, 49 L.Ed.2d at 164–65.

Finally, in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Supreme Court held that a state may adopt any of various approaches for settling church property disputes so long as the approach involves no consideration of doctrine. *Id.* at 602, 99 S.Ct. at 3025, 61 L.Ed.2d at 784. The Court explicitly approved neutral principles as an alternative to the *Watson* deference approach in resolving hierarchical church property disputes. *Id.* at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785. It distinguished the approaches by noting that compulsory deference, unlike neutral principles, requires inquiry into church polity to determine where church authority lies and whether an ecclesiastical decision of the controversy has been made. In contrast, the neutral principles approach requires examination of sources like those in *Maryland & Virginia Eldership* to determine where ownership and control of church property is vested. The Court said:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges.

*Id.* at 603, 99 S.Ct. at 3025, 61 L.Ed.2d at 784–85. The Court concluded that the national church had no interest in the local church property and that title was in the local congregation.

The *Jones* decision did not resolve the issue of which faction constituted the local congregation, and the case was remanded to permit the Georgia courts to adjudicate

that issue. The Court suggested two methods that would be consistent with the first amendment. One is a presumptive rule of majority control, "defeasible upon a showing that the identity of the local church is to be determined by some other means ...." *Id.* at 607, 99 S.Ct. at 3027, 61 L.Ed.2d at 787. The other is a rule of deference to the decision of the church's hierarchical tribunal. Upon remand, the Georgia court applied a presumptive rule of majority control. *See Jones v. Wolf,* 244 Ga. 388, 260 S.E.2d 84 (1979).

This court quoted the *Watson* compulsory deference principle with approval in *Bethany Congregational Church v. Morse,* 151 Iowa 521, 522–23, 132 N.W. 14, 18 (1911). Other decisions involving hierarchical church disputes are consistent with the *Watson* approach. *See, e.g., Helbig v. Rosenberg,* 86 Iowa 159, 53 N.W. 111 (1892); *Bird v. St. Mark's Church of Waterloo,* 62 Iowa 567, 17 N.W. 747 (1883); *First Constitutional Presbyterian Church v. Congregational Society,* 23 Iowa 567 (1867). The departure-from-doctrine concept was employed in resolving disputes between factions of local churches. *See, e.g., Ragsdale v. Church of Christ in Eldora,* 244 Iowa 474, 55 N.W.2d 539 (1952); *Keith v. First Baptist Church of Algona,* 243 Iowa 616, 50 N.W.2d 803 (1952). That concept can, of course, no longer be used by the courts.

Plaintiffs in this case include the First United Presbyterian Church, Kamrar, Iowa, four of its members, the Presbytery of North Central Iowa, and the United Presbyterian Church in the United States of America (UPCUSA). Defendants are the Community Church of Kamrar, Hamilton County, Iowa and the trustees of that church. The petition is in equity. Plaintiffs alleged defendants illegally appropriated the real and personal property of plaintiff First United Presbyterian Church of Kamrar which was held in trust for UPCUSA. They asked for an accounting, injunctive relief, and recognition of the trust. Defendants denied the material allegations of the petition, alleged the First United Presbyterian Church of Kamrar became the Community Church of Kamrar through restated articles of incorporation, and asserted property rights and freedom of religion in bar of the action.

Like *Jones v. Wolf,* the present case involves a hierarchical church and a dispute between factions of the local congregation. The national organization in *Jones,* however, was the Presbyterian Church of the United States (PCUS) rather than UPCUSA. The constitution of UPCUSA contains provisions dealing with church government that were not shown in *Jones* to be in the PCUS constitution. Therefore the neutral principles approach would not necessarily produce the same result in this case.

Our de novo review shows that the Presbytery of Waterloo organized a Presbyterian church in Kamrar in 1875 at the request of a group of German immigrants. The church was called the First German Church of Poland's Grove in Hamilton County. In 1881, the first minister donated five acres of land to the church. He and others incorporated the church the same year pursuant to what is now the Iowa Nonprofit Corporation Act in Code chapter 504. The church was then named the First Presbyterian Church of Kamrar. It was subsequently reincorporated in 1944 and 1964. In 1964 it was renamed the First United Presbyterian Church of Kamrar. The articles, which were in effect when the present controversy arose, stated the corporation's purpose was "to operate and maintain a Presbyterian church, affiliated with the General Assembly of the United Presbyterian Church in the United States of America."

The articles also provided:

All instruments affecting real estate shall be executed in the name of the Corporation by the Trustees. The Trustees shall have authority to acquire, incumber and dispose of the lease property for the Corporation whether said property be real, personal or mixed when authorized to do so by ¾ vote of the members present at a duly called meeting.

The record does not disclose what was meant by reference to "the lease property." Although the record also does not show how

the original church property was transferred to the corporation, the parties have assumed throughout this action that the First United Presbyterian Church of Kamrar held legal title to all the church property when the events resulting in a schism within the local church occurred in 1980. This property consists of approximately seven acres of land and contains a church building, manse, cemetery, small athletic field, and parking lot. Except for the five-acre donation from the first minister, all other property and improvements were acquired through donations to the church corporation from the local church membership. Like the parties, we will assume for purposes of this decision that legal title to the property was in the First United Presbyterian Church of Kamrar in 1980.

It is undisputed that since its initial organization the local church was affiliated with UPCUSA or its predecessors. At all material times, the church governmental structure has been the same. A local church affiliated with UPCUSA is governed by the session, comprised of the pastor and ruling elders elected by the church membership. The next higher governing body is the presbytery, consisting of the ministers and representatives of local church sessions. Each presbytery elects commissioners to the synod, the next higher body, and the general assembly, the highest governing body.

A portion of the constitution of the UPCUSA is called the Book of Order. It establishes the structure and role of church government. Pursuant to section 34.02 a particular church can be organized only with the approval of the presbytery or its commission. Under section 34.022 the persons "thus received" must subscribe to a covenant including a commitment to "a church relation according to the provisions of the Constitution of the United Presbyterian Church in the United States of America."

According to section 35.01, the hierarchy of governing bodies is based on the principle that a larger part of the general church, "or a representation of it, should govern a smaller, or determine matters of controversy which arise therein . . . and consequently that appeals may be carried from lower to higher judicatories, till they be finally decided by the collected wisdom and united voice of the whole Church."

Section 41.07 gives the session, the local church governing body, "exclusive authority over the uses to which the church buildings and properties may be put . . . ." Section 41.15 provides:

Whenever, after a thorough investigation, and after full opportunity to be heard has been accorded to the session in question, the presbytery of jurisdiction shall determine that the session of a particular church is unable or unwilling to manage wisely the affairs of its church, the presbytery may appoint a commission composed of ministers and ruling elders, with the full power of a session. This commission shall take the place of the existing session, if any, which shall cease to act until such time as the presbytery shall otherwise direct.

In section 42.08 the presbytery is given jurisdiction to decide appeals "and in cases in which the session cannot exercise its authority, shall have power to assume original jurisdiction . . . ." This includes the power to unite, divide or to dissolve churches. The synod and general assembly are made higher judicatories in sections 43.05 and 44.01.

Section 62.04 requires a local church to be incorporated, if local law permits, "to receive, hold, encumber, manage and transfer property, and to facilitate the management of its civil affairs in such manner as may be directed by the session of the particular church from time to time and according to this Constitution." Section 62.08 provides that decisions to sell, mortgage or lease real property are subject to control by the session "and to the permission of presbytery as herein provided." Section 62.12 requires that the permission of the presbytery be in writing. Finally, section 62.11 provides:

Whenever hereafter a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such

property as it may have, both real and personal, shall be held, used, and applied for such uses, purposes and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of the United Presbyterian Church in the United States of America.

Throughout its history, the First United Presbyterian Church of Kamrar participated in and subordinated itself to the general church government of UPCUSA. Permission to build and to borrow was sought and obtained from the presbytery in accordance with the *Book of Order*.

In October 1980, however, dissension within the local church over general church doctrine caused the governing presbytery, North Central Iowa Presbytery, to establish a commission to investigate the Kamrar situation, to conduct hearings, to act as moderator of congregational meetings and to moderate the session. The commission met with the session and church members without resolving the differences. On October 19, 1980, the membership of the Kamrar church held a vote on the question:

Shall the members of this church and this Corporation dissolve their affiliation with the United Presbyterian Church in the United States of America, and change the name of the Corporation, and the Church, to Community Church of Kamrar, and shall the attached Restated Articles of Incorporation be adopted?

The theory of the proponents of disaffiliation was that, by voting to disaffiliate and restating the articles of incorporation under chapter 504A of the Iowa Code (1979) to exclude any reference to UPCUSA, the members of the corporation would effectively transfer title of church property to the restated corporation. *See* Iowa Code § 504.18 (1983).

Ballots were distributed only to active members at the meeting. The tally showed 192 votes in favor of the question, 96 votes against it, and four blank ballots. The trustees in control of the meeting declared the question passed and subsequently obtained a restated certificate of incorporation.

When further attempts at reconciliation failed, the presbytery met on November 8 and 22, 1980, upon notice to members of the Kamrar church, to determine what action to take. The presbytery adopted its commission's recommendations. It ordered the actions of October 19, 1980, set aside; it dismissed the minister of the local church; it removed the session in accordance with section 41.15 of the Book of Order; and it appointed an administrative commission with full powers of the session including powers of trustees and authority over church property. Defendants did not appeal the presbytery's decision to a higher church judicatory.

Thus the lines of dispute for the resulting litigation were drawn. After trial, the trial court entered judgment for plaintiffs, ordering an accounting, directing defendants to vacate the property on certain terms, and declaring the property to be subject to a trust in favor of UPCUSA. This appeal and cross-appeal followed.

In deciding the appeal, we will use both the compulsory deference and neutral principles approaches. After deciding the appeal, we will address the cross-appeal.

■■■■ I. *The compulsory deference approach.* As made clear in *Jones v. Wolf,* the *Watson* compulsory deference approach remains an acceptable method of resolving church property disputes. Under that approach, which has also been approved previously by this court, the decision of the highest authority in a hierarchical church is conclusive on the civil courts in church property disputes. Plainly UPCUSA is a hierarchical church within the meaning of the principle.

■■■■ Although defendants contend the Kamrar church actually functioned as an ecumenical church, it would require an impermissible inquiry into doctrine for us to determine whether this function was consistent with Presbyterian teachings. In any event, the church was organized by the general church and indisputably subordinat-

ed itself to UPCUSA through expression and action. We find that the First United Presbyterian Church of Kamrar belonged to a hierarchical church. Under the compulsory deference approach, the presbytery's decision of the property dispute is therefore conclusive.

In analogous situations, other courts using the deference approach have also ruled in favor of UPCUSA. *See First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States of America,* 430 F.Supp. 450 (N.D.N.Y.1977); *Lowe v. First Presbyterian Church of Forest Park,* 56 Ill.2d 404, 308 N.E.2d 801, *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); *Presbytery of Indianapolis v. First United Presbyterian Church,* 143 Ind.App. 72, 238 N.E.2d 479 (1968); *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States of America,* 92 A.D.2d 164, 461 N.Y.S.2d 903 (1983); *In re Presbytery of Albany,* 35 A.D.2d 252, 315 N.Y.S.2d 428 (1970), *aff'd,* 28 N.Y.2d 772, 321 N.Y.S.2d 377, 269 N.E.2d 918, *appeal dismissed sub nom. Second United Presbyterian Church of Johnstown v. Presbytery of Albany,* 404 U.S. 803, 92 S.Ct. 80, 30 L.Ed.2d 35 (1971); *Presbytery of Cimarron v. Westminster Presbyterian Church of Enid,* 515 P.2d 211 (Okl.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974); *Presbytery of Seattle v. Rohrbaugh,* 79 Wash.2d 367, 485 P.2d 615 (1971), *cert. denied,* 405 U.S. 996, 92 S.Ct. 1246, 31 L.Ed.2d 465 (1972).

■ Defendants allege the compulsory deference approach is applicable only to purely ecclesiastical matters. The cases, including *Jones v. Wolf,* refute this claim. In a hierarchical church, property disputes are resolved by ecclesiastical judicatories.

■ Defendants also allege the trial court's decision denies them free exercise of religion under the first amendment and a statutory right to take the church property with them by restating the articles of incorporation under chapter 504A. Nothing in the court's decision, however, denied individual church members their right to leave

UPCUSA. Their right to leave the church does not include a right to take church property with them. *See Bethany Congregational Church v. Morse,* 151 Iowa 521, 132 N.W. 14 (1911); *Sale v. First Regular Baptist Church of Mason City,* 62 Iowa 26, 17 N.W. 143 (1883). The Supreme Court has upheld the compulsory deference approach as recently as its decision in *Jones v. Wolf,* and no authority supports defendant's first amendment claim.

■ Moreover, defendants could not defeat property rights of UPCUSA, if they existed, by merely voting to disaffiliate and restating the local church's articles of incorporation. If defendants were bound by UPCUSA's decision as the compulsory deference approach provides, they could not avoid their obligation by pursuing a statutory course inconsistent with that obligation. Nothing in chapter 504A purports to override a general church's property rights. Having voluntarily submitted to UPCUSA's system of church government, individual church members were bound by the consequences. The compulsory deference approach makes the decision of the church judicatory conclusive and thus determinative of defendants' rights in the property.

II. *The neutral principles approach.* The trial court said the result would be the same under a neutral principles of law approach. Defendants disagree.

The neutral principles approach has been involved in five reported cases involving UPCUSA. They are *Presbytery of Riverside v. Community Church of Palm Springs,* 89 Cal.App.3d 910, 152 Cal.Rptr. 854, *cert. denied,* 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979); *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore of the United Presbyterian Church in the United States of America,* 296 Md. 573, 464 A.2d 1008 (1983), *aff'g,* 52 Md. App. 428, 449 A.2d 1190 (1982); *Calvary Presbyterian Church of Baltimore City v. Presbytery of Baltimore of the United Presbyterian Church in the United States of America,* 39 Md.App. 405, 386 A.2d 357, *cert. denied,* 283 Md. 731 (1978); *First Pres-*

*byterian Church of Schenectady v. United Presbyterian Church in the United States of America,* 92 A.D.2d 164, 461 N.Y.S.2d 903 (1983); and *Foss v. Dykstra,* 319 N.W.2d 499 (S.D.1982).

In *Presbytery of Riverside,* the California court affirmed a trial court holding in favor of a local church that unilaterally terminated its affiliation with UPCUSA. The main factual difference between that case and the present one is the extent to which the Palm Springs church functioned as an interdenominational and nondenominational church. The main legal difference is that the *Presbytery of Riverside* decision was based on a trial court finding of fact that the parties did not intend the national church to have an implied trust in the property. The appellate court found that the evidence gave rise to conflicting inferences on that issue. Applying the substantial evidence test, it therefore affirmed the trial court. In contrast, the trial court in the present case found the evidence showed the local church "had agreed to follow the decisions and procedures of the general church tribunals" in all church matters. Based on the extent of local church subservience, the court found that the local church property was subject to a resulting trust in favor of UPCUSA. In any event, our review in this equity case is de novo.

In *Babcock Memorial Presbyterian Church* and *Calvary Presbyterian Church,* the Maryland courts used the neutral principles approach in resolving church property disputes in favor of UPCUSA. In doing so, they relied heavily on the hierarchial control over local church affairs in the UPCUSA Book of Order. The Maryland cases are factually analogous to the present one. They illustrate that courts using the neutral principles approach will nevertheless bind the parties to the secular effects of church constitutions and charters.

In *First Presbyterian Church of Schenectady,* the New York court majority ruled in favor of UPCUSA under the compulsory deference approach. A specially concurring judge and a dissenting judge, however, used the neutral principles approach and reached opposite conclusions on the issue. The views of the specially concurring judge are similar to those expressed in the Maryland decisions.

In the fifth case, *Foss v. Dykstra,* 319 N.W.2d 499 (S.D.1982), the court did not resolve the merits of the dispute. Instead it merely remanded the case with directions to the trial court to re-examine it under the neutral principles approach.

We conclude that the *Presbytery of Riverside* case is distinguishable and that the reasoning of the Maryland courts and the specially concurring judge in the *First Presbyterian Church of Schenectady* case in analogous situations is persuasive. Consequently we agree with the trial court that plaintiffs should prevail on the neutral principles approach in this case.

The present dispute does not turn on the locus of title. We assume, as do the parties, that title is in the local church. The controversy does turn on whether the UPCUSA constitution, pursuant to and subject to which the local church was organized, establishes an implied trust in UPCUSA. We believe it does.

When its provisions are construed together, the Book of Order gives UPCUSA exclusive ultimate control of the uses and disposition of local church property. Local church property decisions are subject to general church approval, and the general church may take over local church government, as it did in this case, when it disagrees with local church handling of church affairs. This is a condition of the organization of local churches. It inheres in the governmental relationship established by UPCUSA's constitution. It is a necessary effect of the comprehensive grant of UPCUSA judicatory authority over the rights of local church members in property and other matters. *See Bethany Congregational Church v. Morse,* 151 Iowa 521, 132 N.W. 14 (1911); *Sale v. First Regular Baptist Church of Mason City,* 62 Iowa 26, 17 N.W. 143 (1883). Nothing relating to the locus of title, articles of incorporation or state property law is inconsistent with this system of

exclusive hierarchical control over the use and disposition of local church property.

 The failure of UPCUSA's General Assembly in 1930 to amend its constitution to provide for an express trust in local church property does not negate the existence, if it otherwise appears, of an implied trust. A 1980 report recites that the 1930 amendment was supported by a majority of churches that voted but failed to carry a majority of those eligible. The report also notes that the general church prevailed in civil litigation on the theory of implied trust before and after the failure of the amendment. Nor does the 1981 action of the General Assembly in adopting such an amendment change our view. The record shows the 1981 amendment was adopted because of uncertainty concerning the effect of *Jones v. Wolf* on the theory of implied trust. It does not affect our determination based on neutral principles that an implied trust exists as a result of UPCUSA's polity giving it determinative authority over the property of its subordinate churches.

We find it unnecessary to decide whether defendants satisfied the statutory requirement of section 504A.39(3) in obtaining the necessary two-thirds votes which the members at their meeting were "entitled to cast" in order to restate the articles of incorporation.

We conclude that the trial court's decree was correct under both the neutral principles and compulsory deference approaches.

 III. *The cross-appeal.* Plaintiffs' cross-appeal challenges an order of the trial court staying plaintiffs' possession of the property until defendants filed notice of appeal and established their right to stay in possession during the appeal by filing a supersedeas bond. We assume, without deciding, that this is not a moot point.

The trial court acted to fill a gap not covered by the rules governing supersedeas. See Iowa R.App.P. 7 and 8. Its authority to do so has been recognized. *See Chicago Rock Island & Pacific Railway v. Woods,* 196 Iowa 1063, 195 N.W. 957 (1923). We

refuse to find that the court's discretion was abused here.

AFFIRMED ON BOTH APPEALS.

All Justices concur except SCHULTZ, J., and REYNOLDSON, C.J., and HARRIS, J., who dissent.

SCHULTZ, Justice (dissenting)

Because I cannot agree with the use of the compulsory deference approach to resolve church property disputes or the manner in which the neutral principles approach is applied, I respectfully dissent. The majority indicates that they use both the compulsory deference and the neutral principle approaches in resolving this property dispute. They decide that the trial court correctly applied both principles. Although the deference principle was correctly applied, I would reject this approach. Instead, I would resolve church property disputes under neutral principles of law since it does not encompass questions of doctrine or faith nor involve the court in determining ecclesiastical rule, custom or law. I deem that the trial court and the majority, contrary to their assertions, have used a deference approach in their application of the neutral principles. Since our review is de novo, I would hold for the local church.

In the past this court has relied upon the compulsory deference approach in resolving church property conflicts whenever the local congregation is a member of a hierarchical church, such as the UPCUSA. Under this approach a local church that unites with the general association does so with an implied consent to this organization and are bound to submit to it. As the majority indicates, we previously employed an implied-trust-departure-from-doctrine concept. Because this doctrine is now prohibited and the neutral principles of law approach is available, I believe that we should re-evaluate our previous position.

While the neutral principles is also based on a contractual rationale, unlike the implied-consent theory of the deference approach, this approach allows "flexibility in ordering private rights and obligations to

reflect the intentions of the parties." *Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775, 785 (1979). In other words, under neutral principles analysis, courts no longer presume the local church, through blind adherence to hierarchical authority, intended to be bound by all subsequent decisions of the hierarchy regarding its property. Rather, courts must examine the parties' outward expression of intent to determine whether they agreed to place the right to control the property in somebody other than the formal titleholder. Most importantly, judicial resolution of church property disputes (under this approach) would be based solely on objective well-established concepts of trust and property law familiar to lawyers and judges. *Id.* Finally, although the supreme court recognized that the application of neutral principles was not wholly trouble free since it requires "a civil court to examine certain religious documents, such as the church's constitution, *for language of trust in favor of the general church.,*" *Id.* at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785 (emphasis added), the court felt that "the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in its application." *Id.*

In conformity with the *Wolf* decision, a court attempting to resolve church property disputes by the application of neutral principles must examine property deeds, local church charters, relevant state statutes and the central church's constitution. The object of the inquiry is to ascertain the parties' intentions and understanding with respect to local church property. In ascertaining these intentions, the court should remain strictly neutral between the parties.

*A. Church property deeds.* The Kamrar church property was acquired through three conveyances to the local church by warranty deeds. None of these deeds indicate a reservation in favor of the central church. The church was first incorporated in 1881 and subsequently reincorporated in 1944 and 1964. Although there is no evidence church property was reconveyed to these corporations, the parties have assumed that at all times material legal title was vested in the local church corporation. Since legal title to the property is vested in the local church, and nothing in the deeds indicates a reservation in favor of the central church, other sources must be examined to see if they provide a basis for implying a trust of the Kamrar property.

*B. Local church charter.* As noted earlier, the Kamrar church was first incorporated in 1881. The articles of incorporation stated the church was to be known as the First Presbyterian Church of Kamrar and the "object of which is to worship God according to the forms and ceremonies of said Denomination." Presumably the denomination refers to the central organization under which it was first organized. These articles also state:

> we assume to ourselves . . . [t]he right to acquire by gift, grant, or purchase such real or personal property as the constituted authorities of said church may think best for church purposes.

Although it is not clear whether "said church" means the central organization or the local church, in the subsequent articles of reincorporation, (1944), the same provision was put in and, there, it is clear this language refers to the local church. In addition to this article reserving control over property to the local church, Article XIV of the 1944 corporate charter states:

> This association . . . [e]xcept as herein modified, adopt as part of its by-laws the discipline of the PRESBYTERIAN CHURCH in the United States of America so far as the same relate to societies of this character and to officers and trustees thereof, and the members of the Association may adopt whatever by-laws to these articles that may seem necessary and desirable.

The final Articles of Incorporation (1966) and the ones in effect when the present dispute arose do not contain a provision similar to the one cited above. Additionally, the stated purpose of the corporation has been somewhat modified from that of the 1881 Articles and 1944 Articles. In particu-

lar, the stated purpose is to "operate and maintain a Presbyterian Church, affiliated with the General Assembly of the United Presbyterian Church in the United States of America."

If the object of an examination of the local church charter is to ascertain whether the local church intended to hold its property in trust for the central church, none of Kamrar Church's Articles of Incorporation support such an inference. In all three corporate charters, power over the property is reserved to the corporation and its members.

The only language that remotely supports such an inference is Article II of the 1964 corporate charter dealing with the corporation's stated purpose to operate and maintain a Presbyterian church affiliated with the UPCUSA. The thrust of this provision, however, is considerably modified by another which allows the corporation to amend, alter, or repeal its Articles of Incorporation in the manner prescribed by Iowa law. Consequently under chapter 504 of the Iowa Code, the local congregation could repeal its stated purpose provision and strike out any reference to the UPCUSA by a majority vote of its members. Iowa Code § 504.19 (1983).

Furthermore, the stated purpose provision of the Kamrar church differs substantially from the corporate charter of two local churches presented to the Maryland courts in a property dispute involving the UPCUSA. *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore of United Presbyterial Church in the United States of America,* 296 Md. 573, 464 A.2d 1008 (1983), aff'g 52 Md.App. 428, 449 A.2d 1190 (1982); *Calvary Presbytery Church of Baltimore City v. Presbytery of Baltimore of the United Presbyterian Church in the United States of America,* 39 Md.App. 405, 386 A.2d 357 (1978).

In both of these cases, the Maryland courts, *purportedly* applying a neutral principles analysis, found an implied trust of local church property in favor of UPCUSA. The majority opinion cites these cases to support its finding of an implied trust here.

While the Maryland courts did rely heavily on hierarchical control in the UPCUSA Book of Order over local church affairs in reaching that result, those cases are not factually similar to the Kamrar situation and should not control our result.

In particular, the local church charter in the Calvary case provided that the church "shall remain forever a Presbyterian Church in doctrine, government, and worship in accordance with standards of the Presybterian Church in the United States of America[n]. . . ." *Calvary* at 410, 386 A.2d at 360. Likewise, in the *Babcock* case, the church charter stated the church was affiliated with the UPCUSA and was under the care of and subject to the jurisdiction of Presbytery of Baltimore and its by-laws shall be subordinate to the Constitution of UPCUSA and nothing herein shall be interpreted to the contrary. *Babcock* at 438, 449 A.2d at 1195. On the basis of these local church charters and the UPCUSA constitution, an implied trust was found.

In conclusion, nothing in the Kamrar church charter supports an inference that the local church intended its property to be held in trust for UPCUSA. Of course this does not dispose of the issue since the court must also look to UPCUSA's constitution to see if any of its provisions provide a basis for implying a trust.

*C. UPCUSA constitution.* In its neutral principle approach the majority's analysis does not seem different in kind than the analysis that is employed in a deference approach. In particular, the majority examines the church polity to ascertain where the constitution places control over local church property. Once it establishes that the central church had *some say over* the uses of local church property in *certain specified* situations, it finds an implied trust over that property in all situations.

The *Wolf* decision indicates that the neutral principle method avoids this kind of in-depth analysis of church polity. Specifically, the majority stated in response to the dissenting minority:

The dissent would require the States to abandon the neutral-principles method, and instead would insist as a matter of constitutional law that whenever a dispute arises over ownership of church property, civil courts must defer to the "authoritative resolution of the dispute within the church itself." It would require, first, that civil courts review ecclesiastical doctrine and polity to determine where the church has "placed ultimate control over the use of the church property...." [T]he neutral-principle analysis obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes.

*Id.* at 605–06, 99 S.Ct. at 3026, 61 L.Ed.2d at 785–86 (citations to the dissenting opinion omitted).

Elsewhere, the *Wolf* court stresses that this approach relies on secular law rather than religious law or custom. It also specifies how the central church and its affiliates can order their relationships to ensure secular recognition of their respective property rights. Specifically, the court states:

The method relies on objective well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts [f]rom entanglement in questions of religious doctrine, polity and practice.... [T]hrough appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine ownership in the event of a schism or doctrinal controversy. *In this manner,* a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of its members.

*Id.,* at 603, 99 S.Ct. at 3025–26, 61 L.Ed.2d at 785. (emphasis added).

Finally, the characterization of neutral principles analysis by the *Wolf* dissenters is also instructive.

Thus, where religious documents such as church constitutions or books of order

must be examined "for language of trust in favor of the general church," "a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." It follows that the civil courts using this analysis may consider the form of religious government adopted by the church members for the resolution of intrachurch disputes only if that polity has been stated, in express relation to church property, in the language of trust and property law.

*Id.* at 611–12, 99 S.Ct. at 3029–30, 61 L.Ed.2d at 790 (citations to the majority opinion omitted).

Based on the characterizations of both the majority and dissent in the *Wolf* decision, the neutral principles analysis is an effort to treat the property relationships of religious societies and its affiliates in purely secular legal terms. It does not depend in the first instance on whether the church government is hierarchical and the local church has submitted to that hierarchical authority. Rather, the thrust of the inquiry is whether, based on a *neutral secular* analysis of all the relevant documents, the court can find in "legally cognizable language" that the *parties intended* to create a trust of local church property in favor of the central church. Not that the central church claims an implied trust or even that it has always relied on one. Most importantly, the ultimate inquiry is whether under Iowa's law of implied trusts the UPCUSA has made a legally sufficient showing to justify impressing a trust upon the Kamrar church property for all purposes and in all situations.

Admittedly, other jurisdictions purportedly applying a neutral principles analysis in church property disputes involving the UPCUSA and local churches have found an implied trust in favor of the central church. *See Calvary Presb. Ch. v. Presbytery of Baltimore,* 39 Md.App. 405, 386 A.2d 357 (1978); *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore of UP-*

*CUSA,* 296 Md. 573, 464 A.2d 1008 (1983) aff'g 52 Md.App. 428, 449 A.2d 1190 (1982); *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States,* 461 N.Y.S.2d 903, 906, 92 A.D.2d 164, 169 (1983) (Mahoney, J., concurring) (majority decided property dispute on the basis of compulsory deference). As noted earlier, there are substantial differences between the local church charters in the Maryland cases and the Kamrar corporate charter. Moreover, there is some question whether the Maryland courts are really applying a neutral principles analysis. *See* dissent's characterization of the first Maryland case purportedly applying a neutral principles analysis. *Wolf* at 612, 99 S.Ct. at 3030, 61 L.Ed.2d at 790 n. 1.

Additionally, other judges applying neutral principles to property disputes involving the UPCUSA have not found an implied trust. *First Presbyterian Church of Schenectady,* 92 A.D.2d at 171, 461 N.Y.S.2d at 907 (Casey, J., dissenting). *Lowe v. First Presbyterian Church of Forest Park,* 56 Ill.2d 404, 415, 308 N.E.2d 801, 807 *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974) (Goldenhersh, J., dissenting) (majority applied compulsory deference principle). *See also Presbytery of Riverside v. Community Church of Palm Springs,* 89 Cal.App.3d 910, 152 Cal.Rptr. 854, cert. den., 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d .389 (1979).

The jurisdiction with the most experience in applying the neutral principles analysis is Georgia. Where there is an express trust provision, the Georgia courts give it civil effect. In *Carnes v. Smith,* 236 Ga. 30, 222 S.E.2d 322, *cert. denied,* 429 U.S. 868, 97 S.Ct. 180, 50 L.Ed.2d 148 (1976), the local church's claim of autonomy over its property was rejected on the basis of an express trust provision in the central church's constitution. Specifically, the constitution provided that all local church property deeds contain a clause that the property was held in trust for both the local and central church. It also provided that, in the absence of a trust clause, a trust was to be implied in favor of the central church if three conditions were met. Thus, although

the local church deed did not have the required trust clause, the Georgia court found the three conditions for an implied trust were satisfied and awarded the property to the central church. *Id.* at 38–9, 222 S.E.2d at 328.

Likewise, in *Crumbley v. Solomon,* 243 Ga. 343, 254 S.E.2d 330 (1979), the Georgia Supreme Court found a trust of local church property on the basis of the central Association's constitution which provided in part that the Association "shall hold all church property, regardless if all members vote to change the church to some other faith." *Id.* at 345, 254 S.E.2d at 332. There, the court held the local church could not now deny the existence of a trust for the benefit of the general church since the local church had participated in making the rule and did not contest its validity for thirty years. *Id.,* at 345, 354 S.E.2d at 333.

Conversely, Georgia courts consistently have refused to imply a trust on local church property in the absence of an express trust provision in the central church's constitution when legal title is vested in the local church. *See Presbyterian Church in the United States v. Eastern Heights Presbyterian Church,* 225 Ga. 259, 167 S.E.2d 658 (1969), *cert. denied,* 396 U.S. 1041, 90 S.Ct. 680, 24 L.Ed.2d 685 (1970) (where on remand from the supreme court decision, *Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), federally stripping Georgia of its right to decided church property disputes by applying the implied-trust-departure-from-doctrine standard, the Georgia court refused to imply a trust on the basis of the PCUS's constitution); *Jones v. Wolf,* 241 Ga. 208, 243 S.E.2d 860 (1978) (no implied trust of local church property found in favor of PCUS) (decision subsequently appealed to supreme court *Jones v. Wolf, supra*).

Although both the majority opinion and the UPCUSA contend that differences between the constitution of PCUS and UPCUSA dictate a different result here, certain statements in UPCUSA's own documents undermine these contentions. Specifically,

the UPCUSA's Report of the Permanent Committee on Conversation of Property in discussing the supreme court's decision in *Jones v. Wolf* states:

> This case involved the property of a particular church of the Presbyterian Church in the United States (PCUS) sometimes referred to as the "Southern Presbyterian Church." Although the constitution of that church is not identical with the Constitution of the United Presbyterian Church in the United States of America (UPCUSA), the polities of the two are sufficiently similar and the language of the opinion is sufficiently far-reaching that this committee is convinced that the case causes confusion for United Presbyterians.

Elsewhere, the report states:

> The result in *Jones v. Wolf* was made possible because the Constitution of PCUS does not state explicitly that all property of each particular church is held in trust for the PCUS as a whole. Neither does the Constitution of UPCUSA contain such an explicit provision.

Thus, the UPCUSA's own documents support the view that under the neutral principles analysis, the critical determinant is whether the central church's constitution contains an explicit trust provision. It is one thing to impress a trust upon local church property where the member church knew the central church's constitution contained such a provision or, alternatively, member churches approved such a provision and quite another to reach the same result in the absence of such a clearly expressed intention by the parties.

In this regard, the failure of an amendment to the central church's constitution in 1929 is illuminating. This amendment would have required the local church charters of all participating churches to state its property was held in trust for the central organization. Although the majority opinion and the UPCUSA give short shrift to the failure of this amendment, the fact remains that a majority of the "rank and file" (in this case the Presbyteries) either by refusing to vote on the amendment or by voting negatively failed to approve this addition to the central church's constitution. Since the neutral principles method of resolving church property disputes is an attempt to ascertain the intention of parties (the central church and its local affiliates), the failure of this amendment is highly significant. *See First Presbyterian Church of Schenectady*, 92 A.D.2d at 174, 461 N.Y. S.2d at 909 (1983) (Casey, J., dissenting). Although a trust amendment to the UPCUSA's constitution was finally approved in 1981, it came into being too late to govern the actions of the parties in the present dispute.

In any event, while all of the cases cited above certainly should be considered, none are binding on this court in applying its own neutral principles analysis. Since this approach requires us to look to our secular legal principles governing trusts and property, Iowa's law on implied trust determines the resolution of this property dispute. Before the parameters of this law are set out and discussed, a closer look at the provisions of the UPCUSA's constitution is in order.

The only provision in the constitution that remotely approaches language of a trust is section 62.11 of the Book of Order. This section provides:

> When hereafter a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have, both real and personal, shall be held, used, and applied for such uses, purposes and trusts as the presbytery may direct, limit, appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of the United Presbytery Church in the United States of America.

It should be noted that UPCUSA concedes this provision is not applicable to Kamrar property dispute. Additionally, other judges applying a neutral principles analysis in analogous situations have not relied on this provision to either find or refuse to find an implied trust for UPCUSA. *See First Presbyterian Church of Schenectady*,

92 A.D.2d at 170, 461 N.Y.S.2d at 906 n. 1 (Mahoney, J., concurring); *Id.* at 173, 461 N.Y.S.2d at 908 (Casey, J., dissenting). Consequently, the majority's reliance on this provision to find implied trust in favor of UPCUSA in schism situations where a majority of the local membership votes to disassociate itself from the central church is questionable. Although the Presbytery apparently does have the power to dissolve local churches, section 42.08 of the Book of Order, this provision clearly was not intended to apply to the schism situation presented here. *See also* Iowa Code sections 504.-23–.24 (1983) (these sections provide the same result as this constitutional provision whenever a religious body is deemed extinct).

The majority has laid out the other pertinent provisions of the UPCUSA constitution dealing with the use of property. At best, the inferences arising from the UPCUSA provisions concerning the intention of the parties as to local church property are conflicting. For instance, section 41.07 provides that the governing body of the local church (session) has exclusive authority over the uses of church property. This exclusive authority over church property is modified by section 62.12 which requires the session to obtain written permission from the Presbytery before selling, mortgaging or otherwise encumbering any of its *real* property. Evidence in the record indicates that this provision was adopted during the depression when many member churches were defaulting on their mortgages. Apparently the central organization felt this reflected badly on the whole church body. This interpretation is bolstered by other language in the provision which prohibits local churches from acquiring encumbered or mortgaged real property without permission of Presbytery. Additionally, while permission of Presbytery as to real property may be required when the local church is under its religious jurisdiction, this provision has no impact on a situation in which a majority of local church members have voluntarily removed themselves from the Presbytery's religious jurisdiction. Also, it is specifically limited to real property and says nothing about a local church's personal property. Finally, the question is whether under Iowa's law on implied trusts these provisions constitute a legally sufficient showing for impressing a trust on the Kamrar church property.

Iowa Code section 557.10 provides that "declarations or creation of trusts or powers in relation to real estate must be executed in the same manner as deeds of conveyance; but this provision does not apply to trusts resulting from operation or construction of law." The language in section 557.10 allowing trusts to arise from operation of law was explained in *Dunn v. Zwilling Brothers,* 94 Iowa 233, 237–38, 62 N.W. 746, 747 (1895) in the following manner:

Trusts arising by implication of law are sometimes divided into two classes: *First.* Those which are said to result by operation or presumption of law from certain acts or relations of parties from which an intention to create trust is supposed to exist, and which are called "resulting" or "presumptive" trusts. *Second.* Those which exist by construction of law alone, without any actual or supposed intention that a trust should be created, but merely to assert the rights of parties or baffle fraud. They are called "constructive" trusts. Resulting trusts may arise: "*First,* where a purchaser pays the purchase price, but takes the title in the name of another; *second,* where a trustee or other fiduciary buys property in his own name, but with trust funds; *third,* where the trusts of a conveyance are not declared, or are only partially declared, or fail; and *fourth,* where a conveyance is made without any consideration, and it appears from the circumstances that the grantee was not intended to take beneficially."

Consequently, implied trusts are creatures of common law in Iowa. They may be of two types: constructive or resulting. Constructive trusts are grounded in principles of equity and available to cure unjust enrichment or fraud. Conversely, resulting trusts depend on whether the acts and relationship between the parties manifest an

intention that the titleholder is not entitled to take the property beneficially. Such trusts are implied in fact.

In Iowa, constructive trusts generally require some fraudulent conduct or at least some sort of evidence of unjust enrichment. *See i.e., Loschen v. Clark,* 256 Iowa 413, 420, 127 N.W.2d 600, 604 (1964) (constructive trust is an appropriate remedy to cure unjust enrichment even in the absence of some fraudulent conduct); *McBain v. Sorenson,* 236 Iowa 996, 1004, 20 N.W.2d 449, 454 (1945) (fraud actual or constructive is essential element of constructive trust). Thus, in absence of some unjust enrichment of the local church at the expense of the UPCUSA or fraudulent conduct by the local membership a constructive trust is not available. The record is clear that all funding to acquire the property and also to support church activities was obtained from the local membership. No monetary support flowed from the UPCUSA to the local church. Furthermore, the party seeking to impress a constructive trust upon the legal titleholder has the burden of proof. Such burden can only be met by clear, satisfactory and convincing proof. *See e.g., Groves v. Groves,* 248 Iowa 682, 692, 82 N.W.2d 124, 130 (1957).

A resulting trust seems to be the only available option here. Of the resulting trusts set out in *Dunn, supra,* the only one remotely applicable to the Kamrar church property is number four where property is transferred without consideration and the grantee was not intended to take beneficially. The three deeds conveying legal title to the Kamrar church only recite nominal consideration. However, a resulting trust will not be presumed. The burden is on the party attempting to establish the trust and it must be proved by clear, satisfactory and convincing evidence. *See e.g., Shaw v. Addison,* 239 Iowa 377, 384, 28 N.W.2d 816, 820 (1948); *Ross v. Ross,* 256 Iowa 326, 333, 126 N.W.2d 369, 374 (1964). No evidence in the record indicates the local church was not intended to take beneficially. Although the original five-acre plot was conveyed by a Presbyterian minister the corporate charter at that time indicated the purpose of the church was to worship according to the forms and ceremonies of the denomination. Nothing is said about perpetual alliance to that denomination or that the central organization was intended to be a beneficial taker of the property.

Only one Iowa case on resulting trusts appears to support an implied trust in favor of the UPCUSA. In that case, the court found that although ⅚ of the members had voted to break their ties with a central Presbyterian organization, "the circumstances surrounding and the relations of the parties to the conveyance sufficiently imply a trust, that the property should be used for the purposes of those adhering to and in subordination to the religious denomination." *The First Constitutional Presbyterian Church v. The Congregational Society,* 23 Iowa 567, 574 (1867).

Since the court there seems to contemplate a departure from doctrine aspect in finding an implied trust, this case is not controlling. Moreover, the facts in that case are somewhat different. Specifically, much of the funds for building the church were obtained from the central organization. *Id.*

*D. Statutes governing the holding of church property.* As noted earlier, Iowa statutory law would apparently award local church property to the central denomination whenever a local religious society became "extinct." Iowa Code §§ 504.23, 504.-24. Certainly under the statutory definition, Iowa Code section 504.11, the Kamrar church is not extinct nor is there any evidence in the record that the Presbyery deemed it extinct. Consequently, these provisions do not provide a basis for impressing a trust on local church property where (as here) a majority of the membership decides to withdraw from the religious jurisdiction of the central church.

In summary, neither the deeds to the property nor the articles of incorporation of the local church support an inference that the property of the local church is held in an implied trust. The inference to be drawn from the provisions of UPCUSA's

constitution specifically dealing with local church property are conflicting. These provisions do not establish an implied trust, by clear and convincing evidence, the standard of proof required by Iowa law. Thus, under the neutral principles analysis, the local Kamrar church holds title free and clear of any implied trust in favor of the UPCUSA.

Determining the local church holds title to the property free and clear of an implied trust does not dispose of this property dispute, however. As noted by the majority, two-thirds of the members present at a church meeting voted to disaffiliate from the UPCUSA while one-third wanted to remain with the organization. Thus, the identity of the local church must be determined. Stated otherwise, under a neutral principles analysis, the court must also decide which of the factions within the local congregation is entitled to control the actions of the titleholder and thus control the use of the property. Again *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) is instructive. There the supreme court stated that courts could use a presumptive rule of majority representation in schism situations as long as there was some articulated basis for overcoming this majoritarian presumption. *Id.* at 607–08, 99 S.Ct. at 3027, 61 L.Ed.2d 787. Thus, I would apply this rule to the Kamrar situation. Further, I would hold this presumption could be overcome by provisions in the central church's constitution, the local church charter or relevant state statutes which specifically describe how the identity of the church should be determined when there is a split in the local membership. Since none of these sources directly addresses this issue, I would hold the majority faction within the Kamrar congregation is entitled to control the use of the church property. Accordingly, I would reverse.

REYNOLDSON, C.J., and HARRIS, J., join this dissent.